UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES AVIATION UNDERWRITERS INC., a New York corporation, individually and on behalf of United States Aircraft Insurance Group,<br><br>                                    Plaintiff,<br><br>v.<br><br>AEROSPIKE IRON, LLC, a California limited liability company; and CHARLES BRANDES, a California resident,<br><br>                                    Defendants. | Case No.:  21-CV-758 JLS (BLM)<br><br>**ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT; (2) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; (3) GRANTING IN PART AND DENYING IN PART DEFENDANTS' *DAUBERT* MOTION; AND (4) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' *DAUBERT* MOTION**<br><br>(ECF Nos. 80, 81, 82, 83) |
| AEROSPIKE IRON, LLC; and CHARLES BRANDES,<br><br>                                    Counterclaimants,<br><br>v.<br><br>UNITED STATES AVIATION UNDERWRITERS INC., individually and on behalf of United States Aircraft Insurance Group; ACE AMERICAN INSURANCE COMPANY; and NATIONAL LIABILITY & FIRE INSURANCE COMPANY,<br><br>                                    Counterdefendants. | |

Presently before the Court are four Motions.  Defendants and Counterclaimants Aerospike Iron, LLC ("Aerospike") and Charles Brandes (collectively, "Defendants") filed a Motion for Partial Summary Judgment (ECF No. 81) and a *Daubert* Motion (ECF No. 80).  Plaintiff/Counterdefendant United States Aviation Underwriters ("USAU"); Counterdefendant Ace American Insurance Company ("Ace"); and Counterdefendant National Liability and Fire Insurance Company ("NLF") (collectively, "Plaintiffs") filed a Motion for Summary Judgment (ECF No. 83) and a *Daubert* Motion (ECF No. 82).  The Court held oral argument respecting these Motions on April 11, 2024.  ECF No. 108.  Having carefully considered the Parties' arguments, their submissions, and the law, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Partial Summary Judgment ("MPSJ"), **DENIES** Plaintiffs' Motion for Summary Judgment ("MSJ"), **GRANTS IN PART AND DENIES IN PART** Defendant's *Daubert* Motion, and **GRANTS IN PART AND DENIES IN PART** Plaintiff's *Daubert* Motion.

## BACKGROUND

### I.    Factual Background[1]

#### A.    *Purchasing and Staffing a New Aircraft*

Defendant Brandes founded the investment company Brandes Investment Partners.  ECF No. 100 ¶ 1.  Brandes has owned multiple private aircraft and has set up companies to manage regulatory and tax considerations related to those aircraft.  *Id.* ¶¶ 2–3.

During the events that gave rise to this suit, Brandes' companies employed two pilots relevant here.  One of his companies—Blackhorse, LLC ("Blackhorse")—hired Scott Kitchens around 2019. *Id.* ¶¶ 4–5.  Brandes also brought on Nathan Russell as a "helicopter pilot and personal assistant" in September of the same year.  *Id.* ¶ 18.  Russell's employment letter lists him as an employee of Defendant Aerospike, a limited liability company of which Brandes is the sole member.  ECF No. 83-3 Ex. 42 at 1–2; ECF No. 93-1 ¶ 1.

---

[1] The following facts are undisputed unless otherwise noted.

In July of 2020, Brandes began preparing to purchase an aircraft and helicopter and contacted Kitchens for assistance. ECF No. 100 ¶ 7. Brandes intended to "use [Kitchens] and [Russell]" as pilots for this aircraft. ECF No. 83-3 Ex. 1 at 51:4–51:5. Indeed, on July 22, 2020, Brandes indicated by email that he was putting in an offer on an aircraft, that he would "be using [Kitchens] as pilot and manager," and that he would "use [Russell] as second pilot." *Id.* Ex. 11 at 1. Aerospike then hired Kitchens as "Captain" on August 1, 2020. *Id.* Ex. 12 at 1, 3. Aerospike purchased a 2008 Dassault Falcon 900EX aircraft (the "Covered Aircraft") on or around August 25, 2020. ECF No. 100 ¶¶ 11–12; ECF No. 93-1 ¶ 5. Aerospike held title to the Covered Aircraft and served as its registered owner with the FAA. ECF No. 100 ¶¶ 12, 14; ECF No. 93-2 Exs. 45, 55.

Unsurprisingly, aircraft ownership comes with compliance obligations. Perhaps recognizing these requirements, Aerospike entered into an "Operational Control Agreement" with Brandes, wherein Brandes agreed the Covered Aircraft "shall be operated at all times in compliance with, and all Flight Crew shall be appropriately certified, rated and trained in compliance with . . . all applicable [federal aviation regulations]." ECF No. 107 Ex. 48 at 2. To that end, Kitchens executed a training agreement with Flight Safety International Inc. ("Flight Safety") to secure Covered-Aircraft-specific training for himself and Russell. Russell would begin the training on August 31, 2020, and Kitchens would enroll on October 1 of the same year. ECF No. 93-1 ¶¶ 8–10; ECF No. 100 ¶ 37.

In the meantime, Brandes needed trained pilots. Aerospike thus executed "Contract Pilot Services Letters of Understanding" with two different pilots—Randy Judd and Jerome Eyquem—and hired them "on a contract basis to fly the [Covered Aircraft]." *See* ECF No. 81-3 Ex. 5 at 15:15–15:22; *id.* Ex. 6.

### B. Negotiating an Insurance Policy

On August 17, 2020, Kitchens, acting on behalf of Aerospike and Brandes, called insurance broker Pacific Coast Aviation Insurance Services ("PCAIS") and spoke with Tim Hutter. ECF No. 100 ¶¶ 25–26. The Parties advance different interpretations of the ensuing conversation based on (1) a transcript of an initial interview with Hutter and (2)

Hutter's deposition transcript.

Plaintiffs rely on the interview transcript, wherein Hutter states that Kitchens said he "wouldn't be flying" the Covered Aircraft.  ECF No. 83-3 Ex. 5 at 5:12–5:13.  Hutter also reports that when asked if he would fly the Covered Aircraft, Kitchens said "no, I'm just going to be managing it."  *Id.* at 5:8–5:23, 10:8–10:17.  Lastly, Hutter indicated his "impression was that [Aerospike] was hiring [Judd and Eyquem] to crew the aircraft going forward."  *Id.* at 5:3–5:5.

Defendants point to the deposition, in which Hutter clarified that Kitchens "never said he would never operate the aircraft."  *Id.* Ex. 4 at 18:5–18:10.  Instead, "[a]t that point in time, [Kitchens] told [Hutter] he was going to be remaining in Colorado and that he was at the time managing and/or flying a Gulfstream . . . and wouldn't be flying the [Covered Aircraft] . . . ."  *Id*.

After the August 17, 2020 conversation, Kitchens emailed Hutter and stated, "Let me know what you need to start the process.  I will be using the existing pilots that have been flying the [Covered Aircraft] the last 5 years.  I do not go to school until November."  *Id.* Ex. 6 at Aerospike002870.  In response, Hutter said he was "[s]tanding by for those pilot forms," after which Kitchens sent him pilot history forms ("PHF") for Judd and Eyquem.  *See id.* at Aerospike002871.  Kitchens also signed an authorization appointing PCAIS as Aerospike's "broker of record for the purposes of securing insurance quotations on the [Covered Aircraft]."  *Id.* ¶¶ 40–41.

The PHFs provided a wealth of information about Judd and Eyquem, including the pilot certificates and ratings they held, the status of their medical certificates, the dates of their last Biennial Flight Reviews, whether they had attended the Covered Aircraft's ground and flight training course or its equivalent, and their flying experience in multiple types of aircraft.  *Id.* at Aerospike002872–77.  The forms also asked whether either pilot's certificate had associated limitations, was suspended, or was revoked.  *Id.*

With the information provided by Kitchens in hand, Hutter emailed a Request for Quotation ("RFQ") to multiple insurers—including United States Aircraft Insurance Group

("USAIG"), a group of insurance companies managed by USAU—on Aerospike's behalf. ECF No. 100 ¶ 42; ECF No. 83-3 Ex. 9. Under the heading "Pilots," the RFQ provided the following information: "'As approved by the chief pilot.' Pilots going to school every 8-12 months. See attached PHFs." *Id.* Ex. 9 at USAU000697. The RFQ also listed under the heading "Conditions" the following language: "Pilots As Approved by the Named Insured." *Id.* The RFQ included PHFs for Judd and Eyquem. *See generally id.*; *see also* ECF No. 100 ¶ 43.

Upon receiving the RFQ, USAU Underwriter Drew Whitaker called Hutter to assess the risks associated with the submission. *Id.* ¶¶ 44–45. Whitaker testified: "I believe I asked about the pilots." ECF No. 83-3 Ex. 8 at 30:4–30:22. In response, per Whitaker, Hutter said Judd and Eyquem "would be coming on board as the full-time pilots." *Id.*

After Whitaker spoke with Hutter, USAIG agreed to insure the Covered Aircraft, and Brandes, based on Kitchens's recommendation, accepted. *See* ECF No. 93-2 Ex. 54 at 1. USAU issued a policy (the "Policy") effective as of August 25, 2020. *See* ECF No. 81-3 Ex. 18 at 2. Whitaker emailed the Policy and an invoice to Hutter on September 11, 2020. *See* ECF No. 83-3 Ex. 8 at 44:16–45:16. There is no evidence that USAU requested an insurance application, or that Defendants ever filled one out. *See* ECF No. 93-1 ¶ 47.

### C.    The Policy's Terms

Relevant to this dispute is the Policy's provision regarding pilots. On its "Coverage Summary Page," the Policy—after identifying the Covered Aircraft—identifies the "Pilots" as "[a]ny pilot who has been approved by the 'Policyholder,' or their designee." *Id.* at 1. Under the subheading "Limitations on use," the Policy states "to be covered under your policy the [Covered] [A]ircraft must be . . . *flown only by a pilot or pilots described* [on the Coverage Summary Page]." *Id.* at 5 (emphasis added).

Also relevant is the Policy's coverage for physical damage to the Covered Aircraft. The Policy provides up to $15,650,000 in physical damage coverage with no deductible. ECF No. 81-3 Ex. 18 at 2. If the Covered Aircraft sustains damage and the cost of repairs equals or exceeds the coverage limit, the Covered Aircraft constitutes a "total loss" and

USAIG pays the insured the coverage limit.  *Id.* at 16–17.  Otherwise, USAIG will reimburse the insured for the cost of repairs and transport to and from the repair site, with certain limitations.  *Id.*

### D.  The Covered Aircraft's Flight History

Judd and Eyquem flew the Covered Aircraft on three days in September of 2020.  ECF No. 100 ¶ 38.  On September 3, they flew the Covered Aircraft "out of pre-buy back to San Diego."  *See* ECF No. 83-3 Ex. 15 at 25:23–28:25.  Between September 14 and 15, they flew Brandes to Montana, to Santa Fe, and then back to San Diego.  *Id.*  After the return flight, Brandes told them "I'm sorry you guys are losing your job.  You know, if I didn't have a full-time crew I would hire you guys."  *Id.* Ex. 16 at 14:7–14:20.  Kitchens subsequently contacted Eyquem several times to ask about the plane and indicate "oh, we have a flight for you," but no flight ever materialized.  *Id.* Ex. 15 at 29:21–29:25.

The rest of the Covered Aircraft's flight history involves only Russell and Kitchens.  On or around September 28, 2020, Russell completed his training with respect to the Covered Aircraft and was issued a type rating[2] to fly it.  *See id.* Ex. 14 at 45:8–45:19, 53:22–55:1.  Russell's pilot certificate,[3] however, was subject to limitations: Russell could not operate the Covered Aircraft as pilot in command ("PIC") until he had flown at least 25 hours while supervised by a fully qualified PIC.  *Id.* at 45:12–47:7.  Unlike Russell, Kitchens attended but never completed his training at Flight Safety.  ECF No. 100 ¶ 20.

Kitchens and Russell first flew the Covered Aircraft on November 4, 2020.  ECF No. 81-3 Ex. 9 at AERO000005.  They would complete between eleven and twelve takeoffs and landings by February 10, 2021.  ECF No. 93–1 ¶ 16.  As of February 13, Russell had

---

[2] Under 14 C.F.R. § 61.31(a), a "person who acts as a pilot in command" of "[l]arge aircraft," "[t]urbojet-powered airplanes," or "[o]ther aircraft specified by the [FAA]" "must hold a type rating for that aircraft." A "type" is a "specific make and basic model of aircraft," and a "rating" is a "statement that, as a part of a certificate, sets forth special conditions, privileges, or limitations."  *Id.* § 1.1.

[3] An airman certificate is a document issued by the FAA to an individual who is "qualified for, and physically able to perform the duties related to, the position to be authorized by the certificate."  *See* 49 U.S.C. § 44703(a).  These include pilot certificates.  *See* 14 C.F.R. § 61.3(a).

amassed just 16.7 hours of experience in the Covered Aircraft.  ECF No. 100 ¶ 91.

### E.    Purchasing Helicopter Insurance

In December of 2020, Defendants sought insurance for a helicopter from USAU. *See* ECF No. 100 ¶ 99.  As part of this process, Kitchens emailed a PHF for Russell to Hutter that indicated Russell had a type rating/had attended a training course for the Covered Aircraft.  ECF No. 88-2 Ex. 33 at PCA00691.  Though the PHF listed the Covered Aircraft under Russell's "Pilot-In-Command Aircraft Experience," it did not indicate that Russell had spent any hours flying it.  *Id.*  Hutter responded by instructing Kitchens to have Russell delete the reference to the Covered Aircraft within his Pilot-In-Command Aircraft Experience, "substitute [the helicopter], and add his time in it."  *Id.* Ex. 34 at PCA000694.

Whitaker received Russell's PHF—with Hutter's edits—and after seeing that Russell had received training associated with the Covered Aircraft, contacted Hutter to ask why.[4]  ECF No. 83-3 Ex. 8 at 54:9–56:12.  Whitaker testified that he was considering amending the Policy to limit Russell's ability to serve as pilot.  *Id.* at 54:24–57:7.  Hutter then contacted Kitchens, who told Hutter that Russell just wanted to learn the Covered Aircraft's system in the event of an emergency.  ECF No. 100 ¶ 100.  By the time Kitchens made that statement, Russell had flown the Covered Aircraft multiple times.  *See* ECF No. 81-3 Ex. 9.  Hutter passed on Kitchens' message, and Whitaker did not attempt to amend the Policy terms.  *Id.* Ex. 8 at 54:24–57:7.

### F.    The Accident

On February 13, Russell and Kitchens aborted an attempted takeoff in the Covered Aircraft, after which point the Covered Aircraft overran the runway, struck a berm, and slid to a halt on a gravel pad.  ECF No. 100 ¶¶ 58–61.

### G.    USAU's Investigation

Hutter, acting on behalf of Aerospike, notified USAU claims adjuster Chandler White about the accident.  *Id.* ¶ 64.  USAU then began recovery efforts.  *Id.* ¶¶ 66–73.

---

[4] The Parties dispute whether Whitaker was informed that Russell had *flown* the covered aircraft.

Shortly thereafter, FAA investigator Oded Moore contacted White and insinuated that there was an issue with Kitchens's FAA license. *Id.* ¶¶ 75–76. Two weeks later, Moore called John Watson, White's superior at USAU, and informed him that Kitchens's pilot certificate had been revoked prior to the accident. *Id.* ¶ 79. USAU then, among other investigatory efforts, twice requested all documents in Defendants' possession relating to Kitchens and Russell. *Id.* ¶¶ 79–86. In the first request it sent to Aerospike and Brandes, USAU reserved its rights under the Policy and applicable law. ECF No. 81-3 Ex. 30.

### H.   The FAA's Actions

During USAU's investigation, the FAA was also looking into the accident. In June of 2021, the FAA sent a letter to Kitchens stating that, in 2019, the FAA had "revoked . . . any airman certificate of any kind held by [him]." ECF No. 83-3 Ex. 37 at 1; *see also id.* Ex. 36. Per the FAA's letter, Kitchens did not hold "any certificates or ratings" following the revocation, including during his flights in the Covered Aircraft. *Id.* Ex. 37 at 1–2. Kitchens therefore "was not a qualified PIC." ECF No. 83-3 Ex. 46 at 1

In February of 2022, the FAA indicated in a letter to Russell that at the time of the accident, Russell held a "temporary commercial pilot certificate with the DA-EASy type rating added but with [PIC] limitations." *Id.* at 1. Moreover, Russell's airman medical certificate had expired.[5] *Id.* at 2.

## II.   Relevant Procedural Background

USAU filed a Complaint with Jury Demand on April 16, 2021, bringing state law causes of action for (1) rescission of the Policy based on alleged misrepresentations/concealment by Defendants; and (2) declaratory relief stating that coverage is unavailable because the Covered Aircraft was not operated by "pilots" as required by the Policy's terms. *See generally* ECF No. 1.

Defendants filed an Answer with Jury Demand and Counterclaims against USAU, Ace, and NLF on December 21, 2021. *See generally* ECF No. 19. Defendants

---

[5] A medical certificate provides "evidence of physical fitness." 14 C.F.R. § 1.1.

counterclaimed for breach of contract, breach of the implied covenant of good faith and fair dealing ("Bad Faith"), and a declaratory judgment stating that USAU can neither rescind the Policy nor deny coverage under the Policy.  *Id.* at 12–15.

Plaintiffs answered Defendants' counterclaims and raised multiple affirmative defenses, most notably asserting that Defendants "failed to act reasonably to mitigate [their] alleged damages."  ECF No. 35 ¶ 49; ECF No. 36 ¶ 49; ECF No. 37 ¶ 49.  The Parties then completed fact and expert discovery, and the instant Motions followed.

## CROSS MOTIONS FOR SUMMARY JUDGMENT[6]

## I.    Legal Standard

A party may move for summary judgment as to a claim or defense or part of a claim or defense.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  Because facts are "material" only if they may affect the outcome of the case, a genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When a court considers the parties' submissions, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The initial burden falls on the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party seeks summary judgment on a claim for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a

---

[6] Defendants raise evidentiary objections with respect to Plaintiff's summary judgment materials, *see generally* ECF No. 88-1, to which Plaintiffs respond, *see generally* ECF No. 100.  The Court resolves said objections as follows.  Because Kitchens' statements—as testified to by Hutter—are excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2)(D), the Court **OVERRULES** Defendants' objection to said testimony.  Second, as the Court does not consider Hutter's statements—as recorded in White's deposition testimony/emails—for the truth of the matters asserted, the Court **OVERRULES AS MOOT** Defendants' hearsay objection to said statements.  Relatedly, as the Court need not reference at all the remaining materials about which Defendants object, the Court **OVERRULES AS MOOT** Defendants' remaining objections.

directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation marks omitted) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).  Where the non-moving party has the burden at trial, however, the moving party may meet their burden by pointing out the absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 325.

Once the moving party satisfies their initial burden, the nonmoving party must "designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248.  "[S]imply show[ing] that there is some metaphysical doubt as to the material facts" does not suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "cit[e] to particular parts of materials in the record" showing the existence of a material dispute. Fed. R. Civ. P. 56.

## II.   Analysis

Plaintiffs move for summary judgment on all USAU's causes of action and all Defendants' counterclaims.  *See* ECF No. 83.  Meanwhile, Defendants move for summary judgment on their counterclaims for breach of contract and declaratory judgment and on USAU's causes of action for rescission and declaratory relief.  *See* ECF No. 81.  Because multiple issues in this case turn on the existence and scope of agency relationships between Defendants, Kitchens, and Russell, the Court first addresses said agency relationships.  The Court will then address the Parties' arguments respecting rescission, contract interpretation, and bad faith.

### A.   Agency

Under California law,[7] an agent is "one who represents another, called the principal, in dealings with third persons."  Cal. Civ. Code § 2295.  "[I]t is the right to control the means and manner in which the result is achieved that is significant in determining whether

---

[7] The Parties agree that California law applies to their claims.

a principal-agency relationship exists." *Wickham v. Southland Corp.*, 213 Cal. Rptr. 825, 832 (Ct. App. 1985). "The existence and scope of an agency is generally a question of fact, unless the essential facts are undisputed and subject to only one inference, in which case it is a question of law." *Clarendon Nat. Ins. Co. v. Ins. Co. of the W.*, 442 F. Supp. 2d 914, 936 (E.D. Cal. 2006) (citations omitted), *aff'd sub nom. Clarendon Nat. Ins. Co. v. H & G Transp., Inc.*, 290 F. App'x 62 (9th Cir. 2008).

### 1. Kitchens's and Hutter's Agent Status

As Defendants appear to concede, Kitchens was an agent of both Defendants with respect to his efforts to secure the insurance policy. *See* ECF No. 102 at 8–9. Kitchens was employed as "Captain" of Aerospike as of August 1, 2020, and was expressly authorized by both Aerospike and Brandes to "interact with the insurance broker and procure aircraft insurance on *their* behalf." ECF No. 100 ¶¶ 17, 26 (emphasis added).

Relatedly, as Defendants do not contest Hutter's status as Aerospike's agent, *see* ECF No. 81-1 at 11, the Court presumes for purposes of resolving the Motions that Hutter was Aerospike's agent during his efforts to secure the Policy. California law recognizes that an agent may delegate his powers to another person. *See* Cal. Civ. Code § 2349. Here, Aerospike executed an authorization, signed by Kitchens, which appointed Hutter's brokerage firm as Aerospike's broker of record for purposes of securing insurance quotes. ECF No. 100 ¶¶ 26, 40–41. Moreover, courts applying California law have found insurance brokers to be policyholders' agents with little analysis. *See, e.g.*, *Merchs. Fire Assurance Corp. v. Lattimore*, 263 F.2d 232, 240 & n.7 (9th Cir. 1959); *LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.*, 67 Cal. Rptr. 3d 917, 923–24 (Ct. App. 2007).

### 2. Imputation of Knowledge

Though Defendants concede Kitchens acted as their agent, Defendants argue Kitchens' knowledge[8] of the status of his pilot certificate cannot be imputed to them because Kitchens would have been fired if he disclosed his lack of a pilot's certificate to

---

[8] As will become clear below, Defendants' knowledge is an element of Plaintiffs' 'rescission claim.

Brandes.  ECF No. 102 at 9.   A principal "is chargeable with and is bound by the knowledge of . . . his agent received while the agent is acting within the scope of his authority and which is with reference to a matter over which his authority extends," even if said knowledge is never communicated to the principal.  *Columbia Pictures Corp. v. De Toth*, 197 P.2d 580, 586 (Cal. Ct. App. 1948).   A "principal is [also] charged with knowledge which his agent acquires before the commencement of the relationship when that knowledge can reasonably be said to be present in the mind of the agent while acting for the principal." *Id.* at 587.  Knowledge is imputed from both agents and subagents.  *See Trane Co. v. Gilbert*, 73 Cal. Rptr. 279, 283 (Ct. App. 1968).

Under California law, however, "[w]here the interest of the agent is adverse to his principal, the knowledge of the agent will not be imputed to the principal." *People v. Park*, 151 Cal. Rptr. 146, 154 (Ct. App. 1978).  California courts have thus refused to impute knowledge to a principal where an agent has stolen from it, *see Mott v. Nardo*, 166 P.2d 37, 41 (Cal. Ct. App. 1946); *L.A. Inv. Co. v. Home Sav. Bank of L.A.*, 182 P. 293, 295 (Cal. 1919); where an agent has conspired with/represented a third party against the interest of the principal, *see Park*, 151 Cal. Rptr. at 154; *Thompson v. Williams*, 12 Cal. Rptr. 9, 11 (Ct. App. 1961); and where an agent ignored an express limit on their authority, *see Burns v. McCain*, 290 P. 623, 624–25 (Cal. Ct. App. 1930).

The adverse interest exception does not apply here.  Persuasive authorities have defined the adverse-interest exception narrowly.  The Restatement (Second) of Agency applies the exception where "the agent secretly is acting adversely to the principal and *entirely for his own or another's purposes*."  Restatement (Second) of Agency § 282 (Am. L. Inst. 1958) (emphasis added); *cf. O'Riordan v. Fed. Kemper Life Assurance Co.*, 114 P.3d 753, 757 (Cal. 2005) (citing the Second Restatement when determining whether an agent's knowledge could be imputed).  Here, there is no evidence that Kitchens acted entirely for his own purposes; *e.g.*, that he stole from Defendants.

Admittedly, Kitchens had an incentive not to disclose information that might lead his employer to fire him.  But "[t]he mere fact that the agent's primary interests are not

coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for the principal's interests."  Restatement (Second) of Agency § 282 cmt. c.  And in this case, Kitchens' interest in negotiating the Policy was aligned with that of his employer—to secure a policy with beneficial terms.

To conclude otherwise would run counter to the policy goals underlying imputation of knowledge.  The doctrine recognizes that a principal is in the best position to monitor their agent and "create incentives for the proper handling of information."  Restatement (Third) of Agency § 5.04 cmt. b (Am. L. Inst. 2006).  It makes little sense to allow Defendants to take advantage of the benefits of a policy negotiated by Kitchens, while resisting imputation of knowledge based on a conflict that Defendants were in the best position to discover.  Consequently, knowledge acquired by Kitchens while he worked to purchase insurance for Defendants—and knowledge made reasonably present in his mind during that work—can be imputed to Defendants.[9]

### B.   *Rescission*

#### 1.   *Legal Framework*

In California, "an insurer [may] rescind a policy when the insured has [1] misrepresented or [2] concealed material information in connection with obtaining insurance."  *TIG Ins. Co. of Mich. v. Homestore, Inc.*, 40 Cal. Rptr. 3d 528, 532 (Ct. App. 2006).  This right to rescind stems from California's Insurance Code, which "imposes 'heavy burdens of disclosure' 'upon both parties to a contract of insurance.'"  *Mitchell v. United Nat'l Ins. Co.*, 25 Cal. Rptr. 3d 627, 633 (Ct. App. 2005) (quoting *Imperial Cas. & Indem. Co. v. Sogomonian*, 243 Cal. Rptr. 639, 643 (Ct. App. 1988)).

/ / /

---

[9]  Defendants also argue that because Kitchens' license was revoked in 2019—prior to Kitchens's employment with Aerospike—Kitchens did not acquire knowledge of said revocation while acting within the scope of his agency.  ECF No. 102 at 8.  However, when Hutter asked Kitchens to provide him with PHFs that inquired into pilot certifications, qualifications, and experience, said inquiry must have rendered Kitchens's alleged knowledge regarding his lack of certification "reasonably . . . present in" his mind and thus imputable.  *See Columbia Pictures Corp*, 197 P.2d at 587.

Division 1, Part 1, Chapter 3 of California's Insurance Code defines both concealment and misrepresentation. Concealment is the "[n]eglect to communicate that which a party knows[] and ought to communicate." Cal. Ins. Code § 330. Each party to an insurance contract ought to "communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." *Id.* § 332. A misrepresentation, by comparison, is an "assertion[]" or "stipulation[]" to which the "facts fail to correspond." *Id.* § 358. A party seeking to rescind based on either concealment or misrepresentation need not show an "actual intent to deceive." *Thompson v. Occidental Life Ins. Co.*, 513 P.2d 353, 360 (Cal. 1973) (en banc).

To justify rescission, misrepresentations and/or concealed information must be material, *i.e.*, must "have affected the insurer's underwriting decision." *Superior Dispatch, Inc. v. Ins. Corp. of N.Y.*, 104 Cal. Rptr. 3d 508, 520 (Ct. App. 2010). Put differently, courts inquire into "whether the insurer was misled into accepting the risk or fixing the premium of insurance." *Holz Rubber Co. v. Am. Star Ins. Co.*, 533 P.2d 1055, 1065 (Cal. 1975) (en banc). "This is a *subjective* test . . . ." *Sogomonian*, 243 Cal. Rptr. at 644.

"[A] rescission effectively renders the policy totally unenforceable from the outset so that there was never any coverage and no benefits are payable." *Id.* at 645. "[U]nder the authorities, the burden of proving misrepresentation rests upon the insurer." *Thompson*, 513 P.2d at 362. "Summary judgment of rescission may be properly granted for the insurer where the only reasonable inference to be drawn from the evidence presented is that 'the false negative answers and omissions of [the applicant] were material to [the insurer's] decision to provide insurance coverage.'" *Unionamerica Ins. Co. v. Fort Miller Grp., Inc.*, 590 F. Supp. 2d 1254, 1259 (N.D. Cal. 2008) (alterations in original) (quoting *Sogomonian*, 243 Cal. Rptr. at 645).[10]

---

[10] Some courts have stated that materiality is a question of law. *See, e.g., Merced Cnty. Mut. Fire Ins. Co. v. State*, 284 Cal. Rptr. 680, 684 (Ct. App. 1991); *Scroggs v. Nw. Mut. Life Ins. Corp.*, 1 Cal. Rptr. 189, 190 (Ct. App. 1959). However, more recent authorities have stated that "materiality is generally a question

### 2.     *Timing of Misrepresentations/Concealment*

Plaintiffs argue that Chapter 3 of California's Insurance Code allows them to rescind based on misrepresentation/concealment that occurred after policy issuance.  They rely on the following language: "[i]f a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract *from the time the representation becomes false*."  Cal. Ins. Code § 359 (emphasis added).

When viewed in context with the other provisions of Chapter 3, Plaintiffs' interpretation of § 359 cannot stand.  Section 351 states that "[a] representation may be made at the time of, or before, issuance of the policy."  The clear implication of § 351 is that a representation made *after* the issuance of the policy is not actionable under § 359.  This reading, moreover, is consistent with § 359's text; the time at which a representation becomes *false* says nothing about the time at which a representation must be made.

Nor can Plaintiffs' argument be sustained with respect to concealment.  True, Chapter 3 does not contain an equivalent provision to § 351 governing the timing of concealment.  But § 334, governing materiality, asks whether the facts concealed would help the party to whom the communication is due "in forming his estimate of the disadvantages of the *proposed* contract."  Cal. Ins. Code § 334 (emphasis added).  This language suggests that concealment, to be actionable under § 331, must occur prior to formation.  Indeed, it makes little sense to preclude liability for misrepresentations made after policy issuance but allow liability for concealment in the same situation.

The relevant authorities, though scarce, are in accord.  A leading treatise notes that "[t]he failure of the insured to inform the insurer of acts or conditions occurring after issuance or renewal of the policy will not avoid the policy."  Plitt, *supra* n.10, § 84:9.  Further, the Ninth Circuit has stated that the duty to disclose under California Insurance

---

of fact."  *Mitchell*, 25 Cal. Rptr. 3d at 639 n.9 (internal quotation marks omitted) (quoting *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal. 1997)); *see also* 6 Jordan R. Plitt et al., *Couch on Insurance* § 82:7 (3d ed. Nov. 2023 Update); Hon. H. Walter Croskey et al., *California Practice Guide: Insurance Litigation* § 5:228 (Aug. 2023 Update).  The Court need not resolve the issue at this stage.

Code § 331 (governing concealment) "terminates . . . at the moment of [contract] formation." *Rallod Transp. Co. v. Cont'l Ins. Co.*, 727 F.2d 851, 854 (9th Cir. 1984).

Plaintiffs cite only one case in support of their interpretation, and it is unpersuasive. In *Lincoln Benefit Life Co. v. Dallal*, 500 F. Supp. 3d 1041, 1069 (C.D. Cal. 2020), the court initially interpreted § 359 to apply to post-issuance misrepresentations. But the court subsequently superseded its prior analysis, explaining that it had identified no California case applying § 331 or § 359 "to an insured's post-application submission of a fraudulent claim." *See Lincoln Benefit Life Co. v. Dallal*, 520 F. Supp. 3d 1237, 1245–47 (C.D. Cal. 2021), *aff'd*, No. 21-55152, 2022 WL 605709 (9th Cir. Mar. 1, 2022).

The Court will thus consider only statements or omissions that occurred *before* the formation of the Policy—which, for purposes of this analysis, took place on September 11, 2020.[11]

### 3.   Misrepresentation

Plaintiffs contend Defendants, through their agents Kitchens and Hutter, made the following misrepresentations prior to Policy inception: (1) Kitchens gave Hutter the impression that Judd and Eyquem would crew the aircraft going forward, (2) Kitchens told Hutter that Kitchens would not be piloting the Covered Aircraft, and (3) Hutter told USAU Underwriter Drew Whitaker that Eyquem and Judd would come on board as full-time pilots. ECF No. 83-1 at 4–6, 15–16.

### a.   Representations Not Communicated to Plaintiffs

The Court will begin with Kitchens' statements to Hutter, as Plaintiff's evidence regarding both misrepresentations suffers from the same infirmity: Plaintiffs have offered no evidence that Kitchens' alleged representations were communicated to Plaintiffs. For instance, Plaintiffs offer only evidence that Kitchens told *Hutter—Defendants*' agent—that he would not be piloting the aircraft. *See, e.g.*, ECF No. 83-3 Ex. 5 at 5:8–5:17, 10:8–

---

[11] An insurance contract forms when the "premium [is] paid and the policy delivered." *See Sec. Life Ins. Co. of Am. v. Booms*, 159 P. 1000, 1001 (Cal. Ct. App. 1916). The only evidence offered by the Parties regarding delivery suggests a formation date of September 11, 2020. ECF No. 83-3 Ex. 8 at 44:16–45:16.

10:17.  Indeed, Plaintiffs' underwriter testified that he was not aware of any express representation made by Defendants to Plaintiffs that Kitchens would not fly the Covered Aircraft.  *See* ECF No. 83-3 Ex. 8 at 58:6–58:10.

Though the relevant provisions of California's Insurance Code do not expressly state a requirement that representations be communicated to the insurance company, it is difficult to understand how a representation could have "misled [Plaintiffs] into accepting the risk or fixing the premium of insurance" if Plaintiffs never heard said representation.  *See Holz Rubber Co.*, 533 P.2d at 1065.  So, even assuming that Kitchens made the above representation to Hutter—which Defendants dispute, *see* ECF No. 88-1 ¶ 32—such a representation cannot justify rescission.  The same is true with respect to Kitchens's purported implication to Hutter that Judd and Eyquem would crew the aircraft going forward; no evidence suggests Hutter communicated this "representation" to Plaintiffs.

Plaintiffs cannot rely on *Chan v. ArcSoft, Inc.*, No. 19-CV-05836-JSW, 2023 WL 8260886, at *14 (N.D. Cal. Nov. 29, 2023) to alter the Court's conclusion.  *Chan* emphasized that indirect liability is available when the "substance of the [misrepresentation is] repeated to the plaintiff."  *Id.* (internal quotation marks omitted) (quoting *Bullock v. Philip Morris USA, Inc.*, 71 Cal. Rptr. 3d 775, 792 (Ct. App. 2008)).  Again, even assuming Kitchens made the above representations to Hutter, there is no evidence Hutter communicated the substance of either to Plaintiffs.

   b.   Representations Made to Plaintiffs but Not False

That leaves the final alleged misrepresentation: Whitaker claims he asked Hutter about the pilots described in the PHFs and Hutter told him that "the two pilots that were submitted with [Hutter's RFQ]" "would be coming on board as the full-time pilots."  ECF No. 83-3 at 30:1–30:25.

Per Plaintiffs, these representations are false because at the time Hutter sent the forms and spoke with Whitaker, Defendants intended for Kitchens and Russell to eventually become the full-time pilots of the covered airplane.  *See* ECF No. 83-1 at 16.  Defendants respond that Judd and Eyquem *did* in fact serve as the pilots of the airplane

between August and November, and that neither the forms nor Hutter's statements to Whitaker represent that "Judd and Eyquem would be the *only* pilots of the Aircraft or would be the pilots of the aircraft *forever into the future*." *See* ECF No. 88 at 4.

No reasonable jury could side with Plaintiffs. When Hutter submitted the RFQ, he requested a policy that would allow Defendants to operate the plane even when pilots other than those identified by the RFQ were at the controls. *See* ECF No. 83-3 Ex. 4 at 28:2–29:22. And Plaintiffs do not contest that the Policy provides coverage if qualified pilots other than Judd or Eyquem fly the plane. *See generally* ECF No. 83-1. This understanding is bolstered by Hutter's testimony that he was "told that [Judd and Eyquem] were contract pilots," which, in his experience, showed that they "may not be there forever." ECF No. 83-3 Ex. 4 at 62:19–63:11. Viewed in context, therefore, Hutter's submission of pilot forms for Judd and Eyquem, and his statement that Judd and Eyquem would be the full-time pilots, cannot be reasonably interpreted as representing that only Judd and Eyquem would fly the plane for the duration of the Policy.[12]

Instead, the challenged statements must be understood to represent that *as of the time of contract formation*, Judd and Eyquem would be the covered Aircraft's sole pilots. *See* ECF No. 83-3 Ex. 4 at 62:19–63:1 (presenting Hutter's deposition testimony that "at the time of the policy inception [sic]," he represented to the insurance companies that Judd and Eyquem would be the pilots). Indeed, California law presumes that policy-related representations refer to contract formation. *See* Cal. Ins. Code § 356; *Booms*, 159 P. at 1001. And at the time the Policy was issued, Judd and Eyquem were the Covered Aircraft's only pilots, *see* ECF No. 81-2 Ex. 9, and there is no evidence that Hutter said that Judd and Eyquem would be the full-time pilots *throughout the Policy term*. As Plaintiffs have not rebutted the presumption that Hutters' representations regarding Judd and Eyquem's pilot

---

[12] Nor should "full-time" be understood to require that Judd and Eyquem work as pilots for 40 hours each week. Though full-time in other employment contexts might mean working forty hours per week, that interpretation makes little sense where, as here, a private plane is flown only sporadically. *See generally* ECF No. 81-2 Ex. 9. Instead, full-time must mean that each time an aircraft owner elects to use his plane, he will turn to those pilots.

status referred to the time the Policy was issued—and Hutter's representations were not false at the time the Policy was issued—said representations cannot justify rescission.

Plaintiffs attempt to salvage their position by arguing that Hutters's representations are "misleading half-truths" that constitute misrepresentations. *See* ECF No. 93-1 at 13. But the two cases cited by Plaintiff recognize liability for misleading half-truths where a defendant's representation "'purports to state the whole truth' about a subject." *Beach Dist. Surgery Ctr. v. United Healthcare Servs., Inc.*, No. CV 22-01213-SPG-E, 2022 WL 17887532, at *2 (C.D. Cal. Aug. 8, 2022) (quoting *Lord Abbett Mun. Income Fund, Inc. v. Asami*, No. C-12-03694 DMR, 2014 WL 3417941, at *7 (N.D. Cal. July 11, 2014), *aff'd*, 653 F. App'x 553 (9th Cir. 2016)); *Veolia N. Am., LLC v. Jones Lang LaSalle Ams., Inc.*, No. 21-CV-2096 TWR (BGS), 2022 WL 1813607, at *4, *6 (S.D. Cal. June 1, 2022) (noting an alleged half-truth must have been presented as "a complete statement of fact"). Here, Plaintiffs offer no evidence suggesting that when Hutter made the at-issue statements, he purported to state the whole truth about who would fly the plane for the duration of the Policy.

As no reasonable jury could find that Defendants' agents communicated a false representation to Plaintiffs at or before the issuance of the Policy, the Court **DENIES** Plaintiffs' MSJ to the extent it relies on a misrepresentation theory and **GRANTS** Defendants' MPSJ on the same theory.

### 4. Concealment

To justify rescission on grounds of concealment, Plaintiffs must prove that Defendants (1) knew and (2) did not communicate (3) a material—or believed to be material—fact. *See* Cal. Ins. Code §§ 330, 332. Limiting the Court's analysis to concealment occurring at or before the issuance of the Policy, Plaintiffs identify two facts allegedly concealed by Defendants. First, Plaintiffs assert Defendants should have disclosed that they intended to use Kitchens and Russell as pilots. Second, Plaintiffs contend Defendants should have disclosed Kitchens's and Russell's piloting experience and certificates (or lack thereof). ECF No. 93-1 at 15–16.

### a.    Knowledge

To satisfy their duty under California Insurance Code § 332, a party to an insurance contract need disclose only "facts within his knowledge."  Cal Ins. Code § 332.  Brandes— Aerospike's "Manager" according to a document filed with the FAA, *see* ECF No. 93-2 Ex. 55—intended Kitchens and Russel to fly the Covered Aircraft *eventually* at the time Defendants' agents were negotiating the Policy.  *See* ECF No. 83-3 Ex. 11 at 1.  Brandes and Kitchens also knew that neither Kitchens nor Russell had completed pilot training courses for the Covered Aircraft at the time of policy negotiations.  ECF No. 100 ¶¶ 16, 20–21; ECF No. 107 Ex. 53 at Aerospike00244–45.

Defendants assert that no direct evidence shows Kitchens was aware that his pilot certificate was invalid.  *See* ECF No. 102 at 8–9.  Plaintiffs present evidence, however, that the FAA mailed its order revoking Kitchens's certificates to Kitchens's address.  ECF No. 83-3 Ex. 36 at 1, 8.  This evidence raises an issue of fact regarding Kitchens's knowledge.[13]

### b.    Failure to Communicate

Prior to the inception of the Policy, Defendants never communicated to Plaintiffs that Kitchens and Russell were intended pilots of the Covered Aircraft.  *See, e.g.*, ECF No. 100 ¶ 36.  Moreover, Defendants did not submit PHFs for Kitchens and Russell to Plaintiffs prior to policy inception.  *See id.* ¶ 30.

### c.    Materiality

When determining whether a concealed fact is material, an important consideration involves whether the insurance company inquired as to the fact.  *See Am. Mut. Liab. Ins. Co. v. Goff*, 281 F.2d 689, 693–94 (9th Cir. 1960).  Courts also consider (1) whether the terms of the policy itself ascribe significance to the fact, *Williamson & Vollmer Eng'g, Inc. v. Sequoia Ins. Co.*, 134 Cal. Rptr. 427, 433 (Ct. App. 1976); (2) testimony from the

---

[13] Even if Defendants are correct that they lacked knowledge regarding the status of Kitchens's pilot certificate, Plaintiffs do not rely solely on Defendants' failure to disclose Kitchens's lack of certificate. Instead, Plaintiffs offer expert testimony asserting that Kitchens's—and Russell's—lack of *training in* and experience with the Covered Aircraft would have led them to decline to offer coverage if disclosed.  ECF No. 83-3 Ex. 43 at 66:15–67:14.

insurance company's underwriters and agents regarding the significance of the fact, *Nieto v. Blue Shield of Cal. Life & Health Ins. Co.*, 103 Cal. Rptr. 3d 906, 920 (Ct. App. 2010); and (3) whether the concealed/misrepresented fact relates to the risk insured, *see Burns v. Prudential Ins. Co.*, 20 Cal. Rptr. 535, 538 (Ct. App. 1962).

### i.    Policy language

Defendants first argue that because the Policy did not contain a clause limiting coverage to situations where the plane was flown by a pilot disclosed to the insurer, the identities and experience/ratings of pilots other than Judd and Eyquem cannot have been material to Plaintiffs as a matter of law.  *See* ECF No. 102 at 7–8.

Though the terms of (and duties imposed by) the ultimate policy are relevant to a materiality determination, said terms and duties do not dispositively resolve the question of whether information not disclosed *prior to policy issuance* would have affected Plaintiffs' underwriting decision.  This is true because USAU might have chosen different pilot-related policy language had they been made aware of the undisclosed information. So, though the Policy's failure to reference pilot identities or qualifications is relevant, it does not resolve the issue of materiality conclusively in Defendants' favor.

### ii.    Underwriter Testimony/Risk Assessment

Second, Defendants contend that Plaintiffs have offered only speculation as to the effect of the omission on USAU's underwriting decision.  Defendants are incorrect.

Plaintiffs offer expert testimony from Mitchell Young—a longtime USAU employee, *see* ECF No. 83-3 Ex. 43 at 12:23–12:25, 26:13–26:15—stating that USAIG underwriters would not have issued the Policy had Russell and Kitchens been identified as pilots initially.  *Id.* at 66:5–67:14.  Young explains that because Kitchens was "new to the aircraft" and "Russell was new to aviation," "[USAIG] would have said this is not a good deal and would have moved on."[14]  *Id.*  Plaintiffs also offer evidence that when Whitaker

---

[14] It is undisputed that Russell had no experience operating multi-engine, jet-propelled, fixed-wing aircraft such as the Covered Aircraft at the time the Policy was issued.  *See* ECF No. 83-3 Ex. 40 at 84:5–84:9 (indicating that the Covered Aircraft was the "only jet [Russell had] ever flown").

learned Russell might fly the Covered Aircraft, Whitaker expressed concern.  Specifically, Whitaker said Russell "c[ould not] fly the [Covered] [A]ircraft" due to his limited flight experience.  *See* ECF No. 83-3 Ex. 5 at 8:2–8:13.  This evidence raises at least an issue of material fact as to whether Kitchens's and Russell's identities and qualifications were material.

## ii.   Plaintiffs' Inquiry

Defendants' last argument precludes summary judgment for either Party. Defendants point out that Plaintiffs never "asked [Defendants] to disclose all potential future pilots as part of the policy placement process."  ECF No. 88 at 13.  They cite *Maryland Casualty Co. v. National American Insurance Co.* for the following proposition:

> Where the insurer fails to question the insured, the latter cannot be said to have concealed facts so as to void the policy unless they are facts which he or she knows, or which a reasonable person should have known, to be material to the risk and unless he or she does so for the purpose of obtaining insurance which could not have been obtained after a disclosure of such facts.

56 Cal. Rptr. 2d 498, 504 (Ct. App. 1996) (alterations adopted and internal quotation marks omitted) (quoting *Olson v. Standard Marine Ins. Co.*, 240 P.2d 379, 385 (Cal. Ct. App. 1952)).  The justification for the *Maryland Casualty* rule appears to hinge on the understanding that absent inquiry from the insurer, an insured is unlikely to know that concealed information is material.  *See Thompson*, 513 P.2d at 360; Plitt, *supra*, § 84:2.

Plaintiffs respond that they sufficiently inquired after the identities of the intended pilots.  ECF No. 93 at 19.  USAU Underwriter Whitaker asked Hutter on a call for "basic" information about the intended pilots.  ECF No. 83-3 Ex. 8 at 30:1–31:6.  Hutter also clarified Judd and Eyquem would "be coming on board as the full-time pilots," *id*., which suggests Whitaker's inquiry focused in part on whether the plane would be flown consistently by Judd and Eyquem.

Plaintiffs also offer evidence suggesting that Defendants were required to submit information about intended pilots known to them alongside the RFQ.  Hutter testified in

his deposition that it was "required of [his RFQ]" that he submit PHFs "prior to binding coverage" that provided information about proposed pilots' certificates, qualifications, and experience in the aircraft.  ECF No. 83-3 Ex. 4 at 54:17–56:5.  Moreover, Hutter notified Kitchens that he needed PHFs to submit the RFQ, and Kitchens in turn provided the forms for Judd and Eyquem only.  ECF No. 83-3 Ex. 6 at Aerospike002871.  This is not a case, therefore, where Defendants had no reason to think their intended pilots' identities and qualifications were material.[15]

To be sure, the record is not entirely one-sided on this issue.  Plaintiffs have not offered evidence identifying the specific questions asked by Whitaker.  Nor does Hutter testify that he was required to submit PHFs for all intended pilots.  Because there is a disputed issue of material fact as to whether Plaintiffs made sufficient inquiry into the intended pilots known to Defendants—and the other materiality factors are not dispositive in either direction—the Court **DENIES** summary judgment to all Parties with respect to Plaintiffs' concealment theory.

### C.    *Declaratory Relief/Breach of Contract*

Both Parties seek summary judgment on whether coverage is available.  Defendants' breach-of-contract and declaratory-judgment claims turn on the availability of coverage, as does Plaintiffs' prayer for declaratory-relief.  *See* ECF No. 81-1 at 18–19; ECF No. 83-1 at 20.  The availability of coverage in turn depends on two issues of contract interpretation: (1) whether the Policy requires that the Covered Aircraft be flown by more than one "pilot"; and (2) whether a person qualifies as a "pilot" if they lack piloting certificates.

#### 1.    *Legal Framework*

In California, the interpretation of an insurance policy is a question of law.  *See Essex Walnut Owner L.P. v. Aspen Specialty Ins. Co.*, 335 F. Supp. 3d 1146, 1150 (N.D. Cal.

---

[15] As the Policy contains no language limiting the effect of rescission to only those policyholders who themselves concealed the information, if either Defendant had sufficient imputed knowledge to be liable for concealment, the other also cannot recover under the Policy.  *See TIG Ins. Co.*, 40 Cal. Rptr. 3d at 533.

2018) (citing *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 627 (Cal. 1995)).  Courts may interpret contracts on summary judgment "absent any dispute as to the underlying facts." *Adler v. W. Home Ins. Co.*, 878 F. Supp. 1329, 1332 (C.D. Cal. 1995).

"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Bank of the W. v. Super. Ct.*, 833 P.2d 545, 551–52 (Cal. 1992) (en banc).  Thus, "the mutual intention of the parties at the time the contract is formed governs interpretation." *AIU Ins. Co. v. Super. Ct.*, 799 P.2d 1253, 1264 (Cal. 1990) (en banc).  Courts infer such intent, if possible, "solely from the written provisions of the [policy]." *Palmer v. Truck Ins. Exch.*, 988 P.2d 568, 572 (Cal. 1999).

California courts apply a three-step analytical process to determine whether coverage is available under an insurance policy.  When interpreting a policy provision, courts first read policy terms in their "'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage.'" *Id.* (internal quotation marks omitted) (quoting *AIU Ins. Co.*, 799 P.2d at 1264).  "If contractual language is clear and explicit, it governs." *Bank of the W.*, 833 P.2d at 552.  If the terms are ambiguous, however, courts proceed to the second step and ask which interpretation would protect "the objectively reasonable expectations of the insured." *Boghos v. Certain Underwriters at Lloyd's of London*, 115 P.3d 68, 71 (Cal. 2005) (internal quotation marks omitted) (quoting *Bank of the W.*, 833 P.2d at 552).  If "this rule does not eliminate the ambiguity," courts end by resolving the ambiguity against the party who drafted the provision—typically, the insurer. *See AIU Ins. Co.*, 799 P.2d at 1264–65; *Boghos*, 115 P.3d at 71.

Policy clauses outlining affirmative coverage obligations are interpreted broadly in favor of the insured, whereas exclusionary clauses are interpreted narrowly against the insurer. *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1213 (Cal. 2003)).  Moreover, "exceptions and exclusions" to coverage must be phrased in "clear and unmistakable language." *Id.* (internal quotation marks omitted) (quoting *State Farm Mut. Auto. Ins. Co. v. Jacober*, 514 P.2d 953, 958 (Cal. 1973) (en banc)).

### 2.    Discussion

At issue here is the Policy's "Limitations on use" section, which sets forth conditions that must be met for coverage to be available.  As the "Limitations on use" section would seem to take away or limit coverage (it outlines not what *is* covered, but instead what *is not* covered), the Court must narrowly construe its language.

#### a.    Pilot or Pilots

The Parties first dispute whether the "Limitations on use" language—"flown only by a pilot or pilots described [on the Coverage Summary Page]"—should be interpreted to preclude coverage when fewer than two pilots are operating the plane.  *See* ECF No. 81-3 Ex. 18 at 5.  Plaintiffs argue that interpreting this language to provide coverage when the airplane is operated by only one pilot would render the "or pilots" portion superfluous. ECF No. 93 at 25.  Defendants respond that the Coverage Summary Page states under the heading "Pilots": "'[a]ny pilot . . .' (singular)."  ECF No. 88 at 21–22 (quoting ECF No. 81-3 Ex. 18 at 1).

In this case, two persons were flying the plane at the time of the accident.  *See* ECF No. 100 ¶ 59.  In such a situation, the Policy is unambiguous and cuts in Plaintiffs' favor; the sentence "flown only by a pilot or pilots described there" must indicate that *when* two persons are flying the plane, *both* must be pilots described on the summary page.  *See* ECF No. 81-3 Ex. 18 at 5.  Put differently, "only" a "pilot or pilots" can fly the plane, not a pilot and a non-pilot together.  *See id.*  So, coverage is not available if either Kitchens or Russell did not meet the Policy's definition of "pilot."

#### b.    Pilot

The Parties' next dispute the Policy's definition of the word "pilot." The Court begins, as it must, by determining whether the disputed provision is ambiguous.  "A policy provision is ambiguous only if it is susceptible to two or more reasonable constructions . . . ."  *Palmer*, 988 P.2d at 573.  Here, a genuine issue of material fact regarding the challenged term's customary usage in the aviation industry precludes the

/ / /

Court from resolving, on summary judgment, whether the challenged term is ambiguous.[16]

Under California law, though the "terms of a writing are presumed to have been used in their primary and general acceptation," extrinsic evidence is admissible to show that contract terms have a "local, technical, or otherwise peculiar signification[] and were so used and understood in the particular instance." Cal. Civ. Proc. Code § 1861; *cf. Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968) (en banc) (holding courts may consider extrinsic evidence even if a contract appears unambiguous). Put differently, California courts consider whether the words of a contract were "used by the parties in a technical sense, or [whether] a special meaning is given to them by usage." Cal. Civ. Code. § 1644. This is true even when the Parties dispute the meaning of an exclusion from coverage. *See Universal Cable Prods., LLC v. Atl. Specialty Ins. Co.*, 929 F.3d 1143, 1156 (9th Cir. 2019).[17]

Plaintiffs argue the definition of pilot, as it is customarily used in the aviation industry, includes only persons who hold all necessary certificates and ratings to operate the aircraft in question. To prevail, Plaintiffs must provide evidence demonstrating that (1) industry participants indeed use "pilot" in this manner and (2) that both parties were either engaged in the relevant industry or had actual or constructive notice of the industry's

---

[16] The existence and scope of customary usage are "to be determined as questions of fact" unless said usage is embodied in a trade code or similar writing. Restatement (Second) of Contracts ("RSC") § 222(2) (Am L. Inst. 1981); *see also Nat'l Am. Ins. Co. of Cal. v. Certain Underwriters at Lloyd's London*, 93 F.3d 529, 537 (9th Cir. 1996) (noting the existence of an industry custom or usage is "in the first instance a question of fact").

[17] Neither party can resort to the first clause of § 1644, *i.e.*, argue the Policy uses "pilot" in a technical sense. To show that a contract term was so used, a party must submit extrinsic evidence of the parties' intent to adopt a special meaning. *See id.* at 1156; *see also AIU Ins. Co.*, 799 P.2d at 1265 (declining to apply a technical meaning "absen[t] . . . evidence that the parties, at the time they entered into the policies, intended the provisions at issue here to carry technical meanings and implemented this intention by specially crafting policy language"). Here, neither Party has so done. This extrinsic evidence requirement, however, does not extend to § 1644's second clause (governing industry custom). *Universal Cable Prods*, 929 F.3d at 1156.

customary usage of the term.  *See id.* at 1153–54 (citing RSC §§ 222(3), 220(1)).[18]

Here, both USAU and Defendants are involved in the aviation industry.  *See* ECF No. 100 ¶¶ 2–4, 44–45, 48.  The Parties offer conflicting evidence, however, as to how the term "pilot" is used in the aviation industry.  Defendants' expert William T. McSwain states: "in short, there is no single universal specialized industry-standard meaning of the term 'pilot.'"  ECF No. 81-4 Ex. B at 9.  In support, Defendants submit examples of pilot warranties offered by other aviation insurance companies that—unlike the Policy—incorporate explicit certificate and training requirements for pilots.  *See, e.g.*, ECF No. 81-3 Ex. 23 at 3.  Plaintiffs' expert Douglas Stimpson, by contrast, derives an aviation-industry definition of pilot from certification requirements stated in federal aviation regulations.  *See* ECF No. 83-3 Ex. 44 at 47:15–52:13.

As whether the challenged policy term is ambiguous depends in part on the resolution of this disputed issue of material fact, the Court **DENIES** summary judgment to all Parties with respect to Plaintiffs' claim for declaratory relief and Defendants' claims for breach of contract and declaratory relief.  *Cf. Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 737 (9th Cir. 1980) (affirming the trial judge's use, during a bench trial, of custom and usage evidence to determine whether a contract was ambiguous).

### D.    Bad Faith

Only Plaintiffs move for summary judgment on Defendants' counterclaim for breach of the implied covenant of good faith and fair dealing.  For the reasons set forth below, Plaintiffs do not succeed.

#### 1.    Legal Framework

Under California law, "[a] covenant of good faith and fair dealing is implied in every insurance contract."  *Frommoethelydo v. Fire Ins. Exch.*, 721 P.2d 41, 44 (Cal. 1986) (en

---

[18] A usage of trade is a "habitual or customary practice" having "such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement."  1 Bernard Witkin, *Summary of California Law* § 778 (11th ed. May 2023 Update) (internal quotation marks omitted) (first quoting RSC § 219; and then quoting RSC § 222(1)).

banc).   To satisfy its obligation, an insurance company must "give at least as much consideration to the interests of the insured as it gives to its own interests."  *Id.*   Thus, "[w]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort."  *Id.*

To prevail on a bad faith claim, an insured must "show: (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause."  *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001). To avoid liability, "an insurer must investigate claims thoroughly; it may not deny coverage based on either unduly restrictive policy interpretations or standards known to be improper; [and] it may not unreasonably delay in processing or paying claims."  *Love v. Fire Ins. Exch.*, 271 Cal. Rptr. 246, 252 (Ct. App. 1990) (citations omitted).

"An insurer's good or bad faith must be evaluated in light of the totality of the circumstances surrounding its actions."  *Wilson v. 21st Century Ins. Co.*, 171 P.3d 1082, 1088 (Cal. 2007).   Courts and juries evaluate the "reasonableness of the insurer's actions . . . as of the time they were made rather than with the benefit of hindsight."  *Century Sur. Co. v. Polisso*, 43 Cal. Rptr. 3d 468, 487 (Ct. App. 2006).   "While the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence."  *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 108 Cal. Rptr. 2d 776, 784 (Ct. App. 2001); *see also Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002).

### 2.    *Reasonable Dispute Doctrine*

Plaintiffs first invoke the reasonable dispute doctrine.   "[A] court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, even if the court concludes the claim is payable under the policy terms, so long as there existed a [reasonable dispute] as [to] the insurer's liability" to pay out benefits under the policy.  *Franceschi v. Am. Motorists Ins. Co.*, 852 F.2d 1217, 1220 (9th Cir. 1988).  This doctrine, however, does not "alter the standards for deciding and reviewing motions for summary judgment."  *See*

*Wilson*, 171 P.3d at 1089.  A defendant is entitled to summary judgment on a bad faith claim only if no reasonable juror could conclude that the defendant's grounds for denying coverage were unreasonable.  *See id.*

Plaintiffs assert that they had reasonable grounds to dispute coverage as a matter of law both with respect to their claim for declaratory relief and with respect to their claim for rescission.  ECF No. 83-1 at 24.  Plaintiffs, however, dedicate negligible space in their briefing to this contention.  *See id*.

Given the inadequacy of Plaintiffs' briefing, the Court concludes that Plaintiffs have not met their initial burden on summary judgment.  *See Celotex*, 477 U.S. at 323; *see also Martinez v. City of Los Angeles*, No. 2:20-CV-10559-FWS-KS, 2023 WL 8686729, at *10 (C.D. Cal. Jan. 4, 2023) (finding that merely arguing "there is no evidence" did not satisfy a defendant's initial burden); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) ("Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial.").  Moreover, even if Plaintiffs had met their burden, the evidence is not as one-sided as Plaintiffs contend.

a.   Policy Interpretation

Where the insurer denies coverage based on the meaning of disputed policy terms, a court may grant summary judgment to the insurer on a bad faith claim if the insurer's proposed interpretation was based on a reasonable construction of ambiguous policy language.  *See Am. Cas. Co. v. Krieger*, 181 F.3d 1113, 1123 (9th Cir. 1999); *Hanson ex rel. Hanson v. Prudential Ins. Co. of Am.*, 783 F.2d 762, 766 (9th Cir. 1985).  A court may not grant summary judgment when the "insurer's interpretation of the policy is sufficiently 'arbitrary or unreasonable' that a jury could conclude it was adopted in bad faith." *Amadeo*, 290 F.3d at 1162 (quoting *Franceschi*, 852 F.2d at 1220).

Here, whether the relevant policy language—the term "pilot"—is ambiguous depends in part on the resolution of a disputed factual issue: whether aviation-industry custom assigns to the word pilot the meaning advanced by Plaintiffs.  As the Court cannot determine whether Plaintiffs' proposed interpretation was based on a reasonable

29

construction of ambiguous policy terms without resolving this disputed factual issue, granting summary judgment on this ground would be premature.

b.     Rescission

"Where no valid ground for rescission exists, the threat or attempt to seek such relief may itself constitute . . . a breach of the covenant of good faith and fair dealing . . . ." *Sogomonian*, 243 Cal. Rptr. at 647 n.16.  Moreover, "denial of a claim on a basis unfounded in the facts known to the insurer, or contradicted by those facts, may be deemed unreasonable." *Wilson*, 171 P.3d at 1087.

Plaintiffs had some facts in their possession suggesting that rescission might be available.  Plaintiffs' claims handlers spoke with Hutter on two occasions, and on both occasions Hutter said Kitchens informed him that Kitchens would not be flying the aircraft.  *See generally* ECF No. 83-3 Ex. 5; ECF No. 83-4 Ex.24.[19]  Plaintiffs also requested and received a copy of Kitchens's email correspondence with Hutter, including an email chain where Kitchens told Hutter: "I will be using the existing pilots that have been flying the plane the last five years.  I do not go to school until November" and provided Hutter with PHFs for Judd and Eyquem only.  *See* ECF No. 83-3 Ex. 34 at 1; *id.* Ex. 6 at AEROSPIKE002870.  Moreover, Plaintiffs' claims handlers received a call from an FAA investigator on March 3, 2021, who informed them that Kitchens's pilot certificate had been revoked before the accident.  ECF No. 100 ¶ 79–80.

Plaintiffs also had facts in their possession, however, suggesting rescission might be unjustified.  Notably, in Kitchens's email to Hutter, Kitchens implies that he may fly the aircraft after he goes to school in November.  *See id.* Ex. 6 at AEROSPIKE002870.  This statement weighs against Plaintiffs' argument that Kitchens falsely represented that he would never fly the aircraft.  Further, Plaintiffs knew or should have known that because

---

[19] Though Defendants raise a hearsay objection to the use of Exhibit 24 to present Hutter's statements for the truth of the matter they assert, testimony from Plaintiffs' claims-handler regarding what Hutter told him is admissible to show the effect of Hutter's statements on the listener; *i.e.*, to show that Plaintiffs' actions were reasonable based on what they had been informed.

there was no evidence that USAU required Defendants to fill out an application for insurance at any point, *see* ECF No. 93-1 ¶ 47, rescission liability on pilot-identity grounds was tenuous.  Given these facts, a reasonable fact finder, drawing all inferences in favor of Defendants, could find that Plaintiffs unreasonably sought rescission.  Thus, even if Plaintiff had met their initial burden, the Court would deny summary judgment.[20]

### 3.   Ace and NLF

Plaintiffs next contend that because Ace and NLF are the sole entities responsible for paying any covered claim under the Policy, they cannot be liable for bad faith.  ECF No. 83-1 at 22.  However, Ace and NLF are each subject to an implied duty of good faith and fair dealing with respect to Defendants because both are parties to the Policy.  *See* ECF No. 81-3 Ex. 18 at USAU000570–71; *Gruenberg v. Aetna Ins. Co.*, 510 P.2d 1032, 1038–39 (Cal. 1973) (en banc).  Further, Plaintiffs have stipulated to a finding that Ace and NLF are principals of USAU, their agent, *see* ECF No. 105 at 2; and do not respond to Defendants' contention that Ace and NLF can be held liable for USAU's actions under California agency law,[21] *see generally* ECF No. 99.  Consequently, the Court **DENIES** Plaintiffs' MSJ to the extent it argues Ace and NLF cannot be held liable for bad faith.

### 4.   No Denial

Plaintiffs finally argue that they are entitled to summary judgment because they have not formally denied coverage, but instead have filed a lawsuit.  *See* ECF No. 83-1 at 24.  California law, however, allows for bad faith liability when benefits are *withheld*—there is no requirement that an insurance company issue a formal denial.  *See Guebara*, 237 F.3d

---

[20] Defendants argue that even if a genuine dispute exists, the reasonable dispute doctrine does not insulate Plaintiffs from liability because Plaintiffs' investigation—and reservation of rights letter—was insufficient.  *See* ECF No. 88 at 24–25.  As the Court has denied summary judgment to Plaintiffs, the Court need not reach this argument.

[21] In California it is "the general doctrine of the law, as it is [the] statutory rule, that a principal is liable to third parties . . . for the frauds, torts, or other wrongful acts committed by such agent in and as part of the transaction of [the principal's] business."  *Otis Elevator Co. v. First Nat. Bank of S.F.*, 124 P. 704, 707 (Cal. 1912).

at 992.  Though the mere filing of a declaratory relief action cannot constitute a breach of Plaintiffs' duty absent other facts showing bad faith, see *Atlas Assurance Co. v. McCombs Corp.*, 194 Cal. Rptr. 66, 74 (Ct. App. 1983), the filing of such an action does not *preclude* a bad-faith action against that insurer, *see Dalrymple v. United Servs. Auto. Assn.*, 46 Cal. Rptr. 2d 845, 854 (Ct. App. 1995).  The Court thus **DENIES** Plaintiff's MSJ on this ground.

## *DAUBERT* MOTIONS

### I.    Legal Standard

The standard for expert testimony relevant here is set forth in Federal Rule of Evidence 702 and interpreted by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny.  Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Courts have interpreted Rule 702 to require that expert evidence be relevant and reliable, *Daubert*, 509 U.S. at 589–95; and that an expert be "sufficiently qualified to render the[ir] opinion," *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010).

"A trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  For instance, where an expert testifies from experience, the "reliability [of the expert's testimony] depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it."  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th

Cir. 2004) (internal quotation marks omitted) (quoting *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000)).  The *Daubert* inquiry is designed to be a flexible one, and "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Primiano*, 598 F.3d at 564.

## II.   Plaintiffs' Motion

Plaintiffs challenge the admissibility of certain opinions by Defendants' expert William McSwain.  ECF No. 82-1 at 2.  McSwain is an attorney and insurance professional with approximately forty years of experience in the aviation insurance industry.  ECF No. 82-6 Ex. 4 at 20–21.  McSwain served as Deputy Director of Claims at USAU, managing the fifty-six-person General Aviation Claims Department.  *Id.*  While there, McSwain "advised underwriters, brokers[,] and insureds on policy language and interpretation, contract[,] and risk management issue[s]."  *Id.*  In 2006, McSwain became chief claims officer for aviation in the Americas at Allianz Global Corporate & Specialty.  As part of this role, McSwain "assisted in drafting insurance policies."  *Id.*  In 2014, McSwain became an independent aviation consultant representing insurers, policyholders, aircraft owners, and pilots in claims handling and underwriting disputes.  *Id.*

Outside of work, McSwain chaired the Insurance and Risk Management Committee of the National Business Aviation Association from 2013 to 2018.  *Id.* at 23.  He has also presented on the construction of aviation insurance policies at multiple locations.  *Id.* at 24.

### A.    *Plaintiffs' Challenge*[22]

Plaintiffs argue that though McSwain "offers several opinions regarding issues related to the underwriting of insurance policies," McSwain "has no experience whatsoever in underwriting."  ECF No. 82-1 at 2.  So, per Plaintiffs, any "underwriting-related opinions" offered by McSwain should be excluded, as he is not qualified to offer those opinions.  *Id.*  Defendants respond that McSwain is sufficiently qualified with respect to

---

[22] Defendants seek to strike a declaration accompanying Plaintiffs' *Daubert* Motion.  *See* ECF No. 87 at 12–13.  As the Court does not consider the declaration when resolving the Motion—and it would not affect the Court's conclusion—the Court **DENIES** Defendants' request as moot.

aviation policy language.  *See* ECF No. 87 at 5–10.

### B.    Analysis

Rule 702 "contemplates a broad conception of expert qualifications."  *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).  "A witness's knowledge of a general professional field may qualify him or her to testify about a specific practice within that field."  *11333 Inc. v. Certain Underwriters at Lloyd's, London*, 261 F. Supp. 3d 1003, 1015 (D. Ariz. 2017).  Indeed, provided that a witness has sufficient experience with the subject matter to testify, "lack of particularized expertise goes to the weight accorded [the expert's] testimony, not to the admissibility of her opinion as an expert."  *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993).

As an initial matter, the Court is unpersuaded that McSwain must have worked as an underwriter to testify as to issues that touch on underwriting.  In *Hangarter*, the Ninth Circuit affirmed the district court's decision to admit a witness's testimony regarding "handling of disability claims" even though the witness was director of the insurer's *medical department* and a board-certified specialist in *medicine*.  373 F.3d at 1018–19.  The Ninth Circuit reasoned that the witness "ha[d] been educated on insurance policy law and disability policy language" and had "participated in round tables in which [insurance company employees] discussed terminating disability policies."  *Id*.  Though McSwain has not worked as an underwriter, he has advised underwriters as to policy language and contract interpretation, has assisted in drafting aviation insurance policies, and for the past ten years has worked as a consultant on matters including aviation underwriting practices.  ECF No. 82-6 Ex. 4 at 20-21.

At the very least, McSwain has sufficient expertise regarding industry custom with respect to language in aviation insurance policies to offer opinions regarding said custom.  Echoing his curriculum vitae, *see* ECF No. 82-6 Ex. 4 at 20, McSwain's Rebuttal Report indicates that he has "draft[ed] and recommend[ed] the content of 'Pilots' clauses in similar policies."  ECF No. 82-4 Ex. 2 at 4.  Moreover, as this case itself reveals, the handling of insurance claims and related litigation will frequently raise issues related to insurance

policy language.  So, to the extent McSwain seeks to testify as to industry custom with respect to the meaning of policy terms, McSwain is qualified.

The Court also concludes that McSwain's experience with underwriting is sufficient to qualify him to offer the following opinions.  In Opinion 9, McSwain opines that "[i]t is very common in the industry to use pilots other than those who were presented with the application and, in my experience, underwriters understand that."  ECF No. 82-3 Ex. 1 at 15.  This opinion does not require specialized knowledge of underwriting techniques.  The same is true with respect to McSwain's observation that offering an open pilot warranty creates a competitive advantage in winning business.  *See* ECF No. 82-4 Ex. 2 at 5.

As both Parties appeared to recognize at oral argument, however, no expert may testify about the ultimate *legal* meaning of the challenged policy terms.  *See McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999).  Nor may any expert testify regarding the subjective intent of the parties (*i.e.*, state what risks the parties actually intended to assume).  *Energy* Oils, 626 F.2d at 737.  The Court thus **GRANTS** Plaintiff's *Daubert* Motion to the extent it seeks to preclude expert testimony about the above two topics.  The Court otherwise **DENIES** Plaintiff's *Daubert* Motion.[23]

## III.   Defendants' Motion

Defendants challenge four of Plaintiffs' experts on multiple grounds.  *See generally* ECF No. 80.  The Court will address each expert in turn.

### A.   *Douglas Stimpson*

Douglas Stimpson has been involved in the aviation industry since 1968.  *See* ECF No. 92–4 Ex. 3 at 12:24.  He has worked as a mechanic, flight engineer, pilot instructor, and mechanic/engineer instructor.  *Id.* at 12:24–18:6.  He also holds numerous Federal Aviation Act ratings/certifications, including flight instructor certifications, a dispatcher certification, mechanic certifications, and pilot certifications.   ECF No. 80-2 Ex. 3

---

[23] Though Plaintiffs also contend—in a single sentence—that McSwain's opinions are not reliable, that argument merely reiterates Plaintiffs' contention that McSwain is not qualified with respect to underwriting.  *See id.* at 8.  The Court therefore only addresses Plaintiffs' qualification argument.

(curriculum vitae). He has logged more than 11,800 hours of flight time. *Id.* In his current role as an accident reconstruction and investigation specialist, Stimpson has worked on more than 4,000 accidents. ECF No. 92–4 Ex. 3 18:6–19:3, 24:19–25:16.

Stimpson offers six opinions, which fall into three categories. First, Stimpson opines as to aviation industry standards with respect to the definition of the term "pilot," relying in part on federal aviation regulations. *See* ECF No. 80-2 Ex. 4 at 4. Second, Stimpson addresses whether Kitchens and Russell complied with federal aviation regulations on the day of the accident. *See id.* Ex. 3 at 6. Lastly, Stimpson suggests that it would be "dangerous and unsafe" for an uncertified pilot to operate an aircraft. *Id.* Ex. 4. at 4.

### 1. Federal Aviation Regulations and Industry Custom

Defendants contend that federal aviation regulations—and industry custom—are irrelevant to this case. *See* ECF No. 80-1 at 5–8. Defendants separately argue that Stimpson's regulations-related testimony consists of "impermissible legal conclusions." *Id.* at 9. Finally, Defendants assert that Stimpson's testimony is unreliable. *Id.* at 10–11. The Court largely rejects all three arguments.

#### a. Relevance

Expert testimony is relevant if it "help[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In other words, an expert's testimony must "logically advance[] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995). As expert testimony poses an increased risk of misleading a jury, courts should exclude evidence as irrelevant unless it "speaks clearly and directly to an issue in dispute in the case[] and . . . will not mislead the jury." *Id.* at 1321 n.17 (9th Cir. 1995).

Stimpson's testimony satisfies this standard. As discussed at length above, Plaintiffs argue that "pilot" as used in the Policy must be given the meaning afforded to it by custom in the aviation industry. *See* ECF No. 92 at 7–8. Stimpson's testimony logically advances that argument. And, as the "standards of the aviation industry are outside of the common knowledge of the public," Stimpson's testimony will be helpful to the jury. *See Escobar*

*v. Nev. Helicopter Leasing LLC*, No. CV 13-00598 HG-WRP, 2019 WL 6311355, at *6 (D. Haw. Nov. 25, 2019).  Moreover, experts can rely on regulations to support their understanding of industry custom.  *See Hangarter*, 373 F.3d at 1017.  The Court therefore declines to exclude Stimpson's testimony on relevance grounds.[24]

### b.  Legal Conclusions

Defendants' impermissible-legal-conclusions argument poses a closer question.  An expert witness cannot offer an opinion on an ultimate issue of law.  *Hangarter*, 373 F.3d at 1016.  Relatedly, "instructing the jury as to the applicable law 'is the distinct and exclusive province' of the court." *Id.* (quoting *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993)).  Rule 702 bars expert testimony along these lines "[b]ecause the jury does not decide such pure questions of law," and therefore "such testimony is not helpful to the jury." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997).

The Ninth Circuit, however, distinguishes situations where challenged expert testimony addresses an ultimate issue of law in the case (inadmissible), from situations where the challenged expert refers to "his understanding" of a statutory provision that is not "directly at issue in the case" while opining as to an issue of *fact* (admissible).  *See Hangarter*, 373 F.3d at 1016–17.  In *Hangarter*, though the expert could not opine that Defendants "acted in bad faith"—the ultimate issue of law in the case—the expert could reference his understanding of state law to support his conclusion that the defendants "departed from insurance industry norms"—an issue of fact.  *Id.*

Here, no party asserts a cause of action grounded in the federal aviation regulations, and therefore the jury will not be asked to decide whether a violation of the federal aviation regulations occurred.  Thus, expert testimony that refers to the federal aviation regulations neither embraces an ultimate issue of law in the case nor infringes on the Court's role in

---

[24] Nor is the fact that Stimpson plans to testify as to custom in the aviation industry, rather than in the aviation-insurance industry, grounds to reject his testimony.  As aviation insurers necessarily work with aviation industry clients, it only makes sense to conclude that aviation industry custom and usage impact the meaning of aviation insurance policy terms.

instructing the jury. Instead, Stimpson's testimony goes to an issue of fact—customary usage of the term "pilot" in the aviation industry. *See Nat'l Am. Ins. Co. of Cal.*, 93 F.3d at 537; *Hangarter*, 373 F.3d at 1017. Stimpson may thus reference the federal aviation regulations—and his understanding of their meaning—while explaining how, in his experience, the word "pilot" is customarily used in the aviation industry. *See id.*; *ImprimisRx, LLC v. OSRX, Inc.*, No. 21-CV-01305-BAS-DDL, 2023 WL 7390842, at *9 (S.D. Cal. Nov. 8, 2023).[25]

The Court will not, however, allow Stimpson to testify directly that Kitchens and Russell *violated* federal regulations; such testimony would violate Federal Rule of Evidence 403. *Cf. In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1016 (9th Cir. 2008) (noting that courts have particular discretion to exclude expert testimony under Rule 403). Here, both sides concede that "the ultimate legal issues do not turn on whether any [f]ederal [a]viation [r]egulation was breached," but instead on whether Kitchens and Russell constituted pilots under the Policy. *See* ECF No. 92 at 11; ECF No. 80-1 at 6–7. Therefore, Stimpson's opinion that a *violation* of a federal aviation regulation occurred is of reduced relevance. Moreover, such an opinion both threatens to confuse the jury as to the ultimate question and risks prejudicing Defendants in the eyes of the jury by painting them as lawbreakers. *See ImprimisRx, LLC*, 2023 WL 7390842, at *9 ("[The expert] will not be permitted to opine on whether [d]efendants routinely violate the law.").

### c.    Reliability

Expert testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (internal quotation marks omitted) (quoting *Primiano*, 598 F.3d at 565). Indeed, "[a]n expert's specialized knowledge and

---

[25] That said, for the reasons discussed in the Court's analysis of Plaintiffs' *Daubert Motion*, neither Stimpson nor any of Plaintiffs' experts will be permitted to testify as to (1) what risks the parties actually intended to assume or (2) the legal meaning of policy terms.

experience can serve as the requisite 'facts or data' on which they render an opinion." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).

Defendants primarily argue Stimpson lacks sufficient experience with federal aviation regulations to testify as to his understanding of what said regulations require. ECF No. 80-1 at 10–11. Defendants point out that Stimpson currently works for a company called Accident Investigation and Reconstruction, Inc. and note that he is not being asked to opine as to the cause of the accident. *Id.* Defendants also point out that—excluding litigation reports—Stimpson has never published or peer-reviewed any articles, papers, or books about federal aviation regulations. *Id.*

Defendants' arguments both mischaracterize the purpose of Stimpson's testimony and apply an overly narrow definition of what constitutes applicable expertise. First, Stimpson is not being offered as an expert solely on the federal aviation regulations, but instead as an expert on custom in the aviation industry. *See* ECF No. 92 at 7–8. Second, "[a] witness can qualify as an expert through practical experience in a particular field, not just through academic training." *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991); *see also Hangarter*, 373 F.3d at 1016–18 (affirming admission of insurance worker's testimony touching on insurance-industry regulations).

Stimpson has sufficient practical experience with federal aviation regulations governing piloting certifications and ratings to render his testimony reliable. As Plaintiffs point out, Stimpson holds multiple pilot and flight-instructor certificates as well as ground-instructor certificates. *See* ECF No. 80-2 Ex. 3 (curriculum vitae). Stimpson has worked as a pilot instructor at multiple points during his career. *See* ECF No. 92-4 Ex. 3 at 14:7–18:14. Lastly, Stimpson testified that he "use[s] the [federal aviation regulations]" pertaining to piloting or maintenance "daily," and that he "teach[es] people to understand them." *Id.* at 21:18–22:8. Indeed, multiple district courts have found Stimpson qualified to testify both about federal aviation regulations and aviation industry custom. *See Escobar*, 2019 WL 6311355, at *5–6; *Fox v. DRA Servs., LLC*, No. 11-CV-248-F, 2012 WL 13020230, at *12 (D. Wyo. May 17, 2012); *Turturro v. United States*, 43 F. Supp. 3d

434, 451 (E.D. Pa. 2014), *aff'd*, 629 F. App'x 313 (3d Cir. Oct. 9, 2015).

　　　　　2.　*Dangerous and Unsafe Conduct*

　　Defendants finally argue Stimpson's second rebuttal opinion should be excluded to the extent it opines that "it would be a dangerous and unsafe practice . . . to allow an individual to operate a Falcon DA-900EX EASy aircraft who is not properly qualified to do so." ECF No. 80-2 Ex. 4 at 4.  Per Defendants, "[t]here is no exclusion in Aerospike's policy for 'dangerous and unsafe' conduct," so Stimpson's opinion is irrelevant.  ECF No. 80-1 at 8.  Plaintiffs respond that Stimpson's testimony in this regard will help the factfinder determine whether Defendants' alleged concealment of their intended pilots was material to the risk insured.  ECF No. 92 at 10.

　　Plaintiffs have the better of the argument.  When considering whether a concealed fact is material, a trier of fact may consider whether that fact tends to increase the risk associated with the insured activity.  *See Burns*, 20 Cal. Rptr. at 538.  Here, Stimpson's opinion as to whether allowing someone who does not comport with the industry definition of "pilot" to operate an aircraft is "dangerous" will help the jury determine whether the lack of a piloting certificate tends to increase the risk of an airplane crash.  The Court thus declines to exclude Stimpson's second rebuttal opinion on relevance grounds.

## B.　*Mitchell Young*

　　Mitchell Young has worked for USAU since 1981.  *See* ECF No. 80-2 Ex. 7A at 1–2.  He began as an underwriter and transitioned to work as the vice president and manager of two branch offices.  *Id.*  Across these roles, he managed all regional underwriting activity, oversaw claims activity generated from each office, and supervised Atlanta's Field Claims Office.  *Id.*  Young then spent four years as a senior vice president and regional manager, six years as the general aviation department manager, and the last two years as a consultant for USAU.  *Id.*

　　Outside of work, Young has held a private pilot certificate since 1974.  *Id.*  He indicates that he has "operated various company owned and rented aircraft for business and personal operations . . . within the framework of the Federal Aviation Regulations" and

that he currently owns and operates an airplane.  *Id.*  Lastly, he has been a member of numerous associations, including the Aviation Insurance Association, the Aircraft Owners and Pilots Association, and multiple business aviation associations.  *Id.* at 3.

Defendants seek to preclude Young from testifying (1) regarding the meaning of federal aviation regulations and (2) that "USAU's claims handling process was in accordance with industry norms and standards and USAU's own policies, procedure and best practices."  ECF No. 80-1 at 13–14 (internal quotation marks omitted) (quoting ECF No. 80-2 Ex. 7 at 7).

### 1.   *Federal Aviation Regulations*

Defendants first renew the relevance and legal-conclusion objections they raise regarding Stimpson's testimony.  ECF No. 80-1 at 16.  Those arguments fail here for the same reasons they did with Stimpson.

Second, Defendants contend "Young's experience as an underwriter and manager at an insurance company are not sufficient to qualify him as an expert in the field of the Federal Aviation Regulations."  ECF No. 80-1 at 16.  Plaintiffs respond that Young's tenure as a licensed private pilot, his experience operating and owning aircraft, and his membership in aviation-related associations qualify him to render opinions that reference aviation regulations.  ECF No. 92 at 17.

Defendants have the better of the argument.  Car owners are not necessarily experts in traffic regulations, and Plaintiffs offer no reason as to why plane owners are different.  In contrast with Stimpson, neither Young's resume nor the portions of Young's deposition cited by Plaintiffs indicate that Young has any experience working with federal aviation regulations, teaching others about them, or applying them to factual situations.  The Court will therefore bar Young from testifying regarding federal aviation regulations.

### 2.   *Claims Handling*

In a reversal from the Parties' dispute over McSwain, Defendants contend Young lacks sufficient experience with claims handling to opine regarding claims-handling procedures.  Defendants seize on the following statement from Young's deposition: "[A]m

I a claims expert or claims handler?  No, I'm not."  ECF No. 80-2 Ex. 6 at 37:4–37:21.  Per Defendants, "[w]here supposed experts have admitted that they are 'not experts,' courts have had little difficulty in excluding their testimony."  ECF No. 101 at 5 (internal quotation marks omitted) (quoting *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1572 (7th Cir. 1991) (Pell, J., concurring in part and dissenting in part)).

The Court sides with Plaintiffs.  For nineteen years, Young (1) managed a branch office that included a field claims office and (2) provided "general oversight and support of claims activity" handled by that field claims office.  *See* ECF No. 80-2 Ex. 7A at 2.  Additionally, Young asserted that "[he] can recognize that the [claim-handling] process went correctly," has "had ongoing discussions with the claims department on tons of issues over the years," and has "reviewed . . . claims."  ECF No. 92 Ex. 4 at 37:12–38:3.  For these reasons, Young is qualified to testify regarding whether Defendants' claim was handled in accordance with other claims whose handling he oversaw.  *See Garcia*, 7 F.3d at 890.

### C.   Morris Smith

Morris Smith is an aviation maintenance specialist who possesses "more than 43 years of business aviation experience."  ECF No. 80-2 Ex. 10 at 190.[26]  He has an airframe and powerplant certificate, bachelor's degree in aviation operations, and associate degree in aviation maintenance from Southern Illinois University.  *Id.* at 192–93.  He has performed and supervised maintenance on a variety of aircraft throughout his career, and "specializ[ed] in aircraft recovery, major structural repair[,] and modification."  *See id.* at 190–193.  Since 2018, Smith has operated a consulting business where he provides technical review and oversight for aircraft owners and insurance companies.  *Id.* at 190.

Defendants challenge Smith's opinions on relevance and reliability grounds.  Though Defendants state that they seek to prevent Smith from offering any opinions at trial, their attacks focus on two opinions.  First, Smith states "the [Covered Aircraft] could

---

[26] All page citations to Exhibits 10 and 11 of ECF No. 80-2 refer to the blue page numbers in CM/ECF.

be repaired." *Id.* Ex. 10 at 172.  Second, Smith opines that the aircraft should have been preserved following the accident; that lack of preservation can cause damage to engines, batteries, and interior components; and that when Smith visited the aircraft a second time following the accident, he saw that "no preservations had been performed on the aircraft." *Id.* at 172–173.

### 1.   Reliability

Defendants challenge the reliability of Smith's repairability opinion, arguing that Smith did not rely on sufficient facts or data.  Plaintiffs point out Smith inspected the aircraft in-person twice.  ECF No. 80-2 Ex. 10 at 171–72.  He photographed damage to the aircraft's external components.  *See generally id.*  He also viewed the interior of the aircraft and saw no visible damage.  ECF No. 92-6 Ex. 5 at 44:10–45:12.  Based on this visual inspection and his experience, Smith concluded it would be possible to repair the aircraft.  ECF No. 80-2 Ex. 11 at 195–96.  Specifically, Smith states that "I have repaired other F-900 aircraft with as bad or worse damage." *Id.* at 195.

Smith, however, explained that "when [he has] prepared quotes for repairs of . . . airplanes, [he] would do further disassembly and further testing of the aircraft to give [him] a good knowledge of the integrity of the aircraft." *Id.* Ex. 12 at 37:18–39:14.  Here, by contrast, Smith had "limited access" to the aircraft and did not inspect the internal components of the engines or the aircraft's avionics for damage.  *Id.* Ex. 10 at 172; *id.* Ex. 12 at 41:7–11, 44:20–47:19.  Similarly, though Smith typically uses laser measurements to evaluate whether an airplane is twisted or bent such that repair might not be possible, here he took no such measurements.  See *id.* at 65:16–65:25.  Lastly, Smith did not investigate the availability of replacement parts for the aircraft.  *Id.* at 64:9–64:22.

In *Kumho Tire Co. v. Carmichael*, the Supreme Court emphasized that an expert, even when basing his testimony on personal experience, must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  526 U.S. 137, 152 (1999).  In this case, Smith has not employed the level of intellectual rigor that he deems important for "get[ting] to the final" determination of

repairability.  ECF No. 80-2 Ex. 12 at 38:24–39:14.  Nor has Smith testified that other experts in the field rely on visual inspections alone to determine repairability.  *See Kumho Tire*, 526 U.S. at 157.  Accordingly, the Court excludes Smith's repairability testimony. Without acquiring more information about the internal/structural conditions of the aircraft and the availability of parts, Smith neither had sufficient information nor applied a reliable methodology.

### 2.    *Relevance[27]*

Defendants argue that because there is no evidence "that Defendants' alleged failure to preserve the aircraft resulted in further damage or a diminution of its value," Smith's opinion concerning the possible negative effects of failing to preserve the aircraft are irrelevant.[28]  ECF No. 80-1 at 19 (footnote omitted).

Smith's opinion regarding preservation is relevant to the ultimate issue of whether Defendants, by allegedly not preserving the aircraft, failed to mitigate their damages. California law requires a party injured by a breach of contract to "do everything reasonably possible to mitigate his or her own loss and thus reduce the damages for which the other party has become liable."  1 Witkin, *supra*, § 944.  Smith's testimony that the aircraft's engines were stored "open to the elements," and that exposure "could result in the engines being economically unreasonable to ever return to service or have salvage value," ECF No. 80-2 Ex. 10 at 172–73, tend to show that the aircraft's improper storage may have increased associated repair costs and thereby made it more likely that the aircraft would constitute a total loss.  The Court thus declines to exclude Smith's preservation opinion.  *See* Fed. R. Evid. 401 advisory committee's note on proposed rules ("[A] fact to be proved may be

---

[27] As the Court has excluded Smith's repairability opinion on reliability grounds, the Court does not address said opinion's relevance.

[28] Defendants' argument appears to target the merits issue of whether any loss of value associated with their alleged failure to preserve can be proved with sufficient certainty.  Such a challenge is beyond the scope of the present *Daubert* Motion; as Defendants have not moved for summary judgment on Plaintiffs' failure-to-mitigate defense, *see generally* ECF No. 81-1, Plaintiffs have not had an occasion to present evidence relating to damage sustained by the aircraft.

ultimate, intermediate, or evidentiary; it matters not, so long as it is of consequence in the determination of the action."); *but see Daubert II*, 43 F.3d at 1321 n.17 (noting *Daubert*'s relevancy requirement is not "merely a reiteration of the general relevancy requirement").

### D.   Kenneth Dufour

Kenneth Dufour is an accredited senior appraiser who has worked as a full-time aircraft and aerospace asset appraiser for over 50 years.  ECF No. 80-2 Ex. 13 at 263.[29] Dufour opines that the aircraft's market value the day before the accident ("retrospective market value") was $13,435,290, and that, post-accident, the aircraft would suffer a diminution of value of $537,411 to $806,117, leaving it with value of between $12,897,879 and $12,629,173 (the "fair market value").  *Id.* Ex. 13 at 5–6.

#### 1.   Relevance

Defendants first argue that the retrospective market value and fair market value of the aircraft are irrelevant because whether the aircraft constitutes a total loss is determined by the coverage limits established by the Policy.  *Id.* at 23.  Defendants' argument ignores, however, an alternative provision in the Policy.  Under the Policy's Aircraft Physical Damage De-Valuation Coverage endorsement, the Policy pays up to $1,565,000 for loss in market value resulting from physical damage to an aircraft that both qualifies as a partial loss and suffers an "Airframe major repair."  ECF No. 80-2 Ex. 5 at USAU000604–05. Dufour's fair-market-value opinion is relevant to establish the damages Defendants could claim under this endorsement.  *See* Fed. R. Evid. 104(b).  And, as Dufour uses his retrospective market value calculation to determine the fair market value of the Covered Aircraft, *see id.* Ex. 13 at 5–6, the retrospective market value opinion is relevant as well.

#### 2.   Reliability

Defendants argue that Dufour's diminution-of-value opinion is unreliable because Dufour relied on too many assumptions.  Defendants point out that Dufour stated in his deposition that his diminution estimate is "based on a hundred percent

---

[29] This page citation refers to the blue page number affixed to the top right corner of the page in CM/ECF.

assumptions . . . . Because I don't have any data. . . . [Nor do I have] any repairs [sic], work invoices, quotes[,] or anything . . . ."  *See id.* Ex. 15 at 128:22–129:9.  Plaintiffs respond that the assumptions upon which Dufour relied are fodder for cross-examination rather than a basis for exclusion.  ECF No. 92 at 22–23.

Defendants' argument is in tension with *Alaska Rent-A-Car*.  There, the Ninth Circuit acknowledged that in damages cases, damages experts' calculations must "address a hypothetical world that never existed."  738 F.3d at 968.  Thus, a damages expert can make assumptions without rendering their opinions inadmissible.  *See id.*; *see also California v. Kinder Morgan Energy Partners, LP*, 613 F. App'x 561, 564 (9th Cir. 2015) ("[The expert's] assumption about the pre-contamination condition of the City's property goes to weight and not admissibility.").  The fact that Dufour relied on assumptions when conducting his analysis does not render his testimony inadmissible.

Instead, the question is whether Dufour's approach and preparation was "of a kind that others in the field would recognize as acceptable."  *See Kumho Tire*, 526 U.S. at 151. As appraisal is "more an art than a science," courts evaluating the reliability of appraiser testimony have considered (1) the extent of the appraiser's experience and (2) the sources consulted by the appraiser.  *Oxford Aviation, Inc. v. Constellation Brands, Inc.*, No. 2:08-CV-419-DBH, 2012 WL 313924, at *1 (D. Me. Jan. 31, 2012).  Dufour's experience is unmatched; indeed, Dufour co-authored textbook chapters on aircraft appraisal and has engaged in "specialized training and teaching of the Diminution of Value subject."  ECF No. 80-2 Ex. 13 at 263;[30] *id.* Ex. 14.  Moreover, as in *Oxford Aviation*, Dufour's report indicates he considered the asking prices of comparable aircraft alongside other market dynamics when reaching his estimates.  2012 WL 313924, at *1; *id.* Ex. 13 at 8, 20–21, 35–38.  Lastly, the Court notes that at least one court has rejected a reliability challenge to Dufour's diminution of value methodology.  *Radair, LLC v. Alaska Airlines, Inc.*, No. 220CV02286MSNCGC, 2022 WL 1666878, at *3–5 (W.D. Tenn. Jan. 20, 2022).  For the

---

[30] This page citation refers to the blue page number affixed to the document in CM/ECF.

above reasons, the Court concludes that Dufour (1) considered sufficient facts/data and (2) applied a reliable methodology.  The Court thus declines to exclude Dufour's testimony.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judgment (ECF No. 83), **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Partial Summary Judgment (ECF No. 81), **GRANTS IN PART AND DENIES IN PART** Plaintiffs' *Daubert* Motion (ECF No. 82), and **GRANTS IN PART AND DENIES IN PART** Defendants' *Daubert* Motion (ECF No. 80).  The Court also **SETS** the following schedule for pre-trial proceedings:

| Event | Deadline |
|---|---|
| File Memoranda of Contentions of Fact and Law and any other action required by Civil Local Rule 16.1(f)(2) | July 25, 2024 |
| Comply with pretrial disclosure requirements of Federal Rule of Civil Procedure 26(a)(3) | July 25, 2024 |
| Meet and take any action required by Civil Local Rule 16.1(f)(4) | August 1, 2024 |
| Plaintiff to provide opposing counsel with Proposed Pretrial Order for review and approval | August 8, 2024 |
| Lodge Proposed Final Pretrial Conference Order with the Court | August 15, 2024 |
| Final Pretrial Conference | August 22, 2024, at 10:00 a.m. |

**IT IS SO ORDERED.**

Dated:  June 11, 2024

Janis L. Sammartino

Hon. Janis L. Sammartino
United States District Judge